(July 10, 1969)

■ In the Matter of CLARENCE Y. PALITZ, JR., et al., as Coexecutors of CLARENCE Y. PALITZ, Deceased, Appellants. ARTHUR F. LAMANDA, as Special Guardian for Certain Infants, et al., Respondents.

Steuer, J. (dissenting). As to the character of the trust for the benefit of Ruth Palitz, I agree with the majority that the disposition of the learned Surrogate was correct, and I concur in affirming that part of the decree.

The chief item of contention represents but one of several controversies which have kept this estate in litigation for 11 years and torn asunder the family ties. The testator's family consisted of his wife, two grown sons and a married daughter. They are now aligned the sons on one side and the mother, with whom the daughter is a passive ally, on the other. Because the mother's attitude provides a significant clue to the nice factual questions involved, it is worth while considering at the outset. And as it rests on uncontroverted testimony and is not merely a psychological deduction, it can be stated with certainty. After her husband's death Mrs. Palitz stated that she wanted to have an interest in her sons' business affairs, not for the money involved but to be able to exercise a degree of parental control over them. She was hostile to the suggestion of the estate's attorney that, in view of the sons' age, the time had come to cut her apron strings. The conflict so engendered is the probable basis for the mother's position and goes far toward explaining the contentions she makes.

Unfortunately the issue cannot be presented without a fairly detailed statement of the background facts. The testator was the founder of Credit America Corporation (CAC), which was in the business of factoring sales of heavy machinery. Four years prior to his death in 1958 the deceased had suffered a heart attack and, while he was still the active directing force of the business, the two sons were the managing executives. In 1957 the father undertook negotiations for a sale of the business to James Talcott, Inc. The reason for this was that he doubted whether the business could be continued successfully in the face of competition from the larger factoring concerns. Negotiations reached a stage where a purchase price of $2,400,000 was agreed upon, representing $1,400,000 for the value of CAC's assets and the balance for the good will of the business. All concerned then, and now, agree that this was a fair price. In addition, Talcott wanted assurance that the Palitzes, father and sons, would not engage in competition with them, and they wanted management for this new department of their business. There were discussions as to the form these arrangements were to take, and there is evidence that the deceased estimated that the compensation to be realized by the Palitzes would be in the neighborhood of $600,000.

At this stage the deceased offered to sell the business to his two sons for the same cash consideration as offered by Talcott. He pointed out that as some 30% of CAC was owned by trusts created for their benefit, they would not have to pay this part of the consideration. In addition, on the stock he owned he would give them a 10% reduction. He suggested that if they wished to take advantage of this offer they proceed to seek financing. The significance of this offer is that under it there is no provision for any contract other than the sales contract. The testator quite evidently believed that under it he and the other stockholders would receive exactly what they would receive by virtue of the Talcott offer, less, of course, the allowance on his personal stock. In other words, the Talcott deal was for $2,400,000, and not $2,400,000 plus an additional consideration.

It was at this stage of negotiations that the deceased died. At that time he owned 51.686% of the stock of CAC. The balance was owned by six *inter vivos* trusts created by the deceased.

After his death the sale of CAC to Talcott was concluded. The sale was executed as originally contemplated but the agreement not to compete and the hiring of the Palitzes necessarily were different. As executed, this took the following form: The two sons became salaried employees of Talcott at will. A corporation whose officers and stockholders were the Palitz sons, and called American Business Audit, Inc. (ABA) was formed. This corporation contracted with Talcott to supply consultant services, and that its officers and stockholders would not engage in any competing business. In return Talcott agreed to pay commissions on a very explicit and detailed basis. The contract was for a five-year period. During this period the commissions provided for and paid amounted to some $2,000,000.

Mrs. Palitz asserted a claim for a percentage of this sum. It was soon apparent that she personally had no basis for any claim. And then she changed her tune. She claims that the brokerage contract between Talcott and ABA was a part of the purchase price of CAC paid by Talcott. As executrix she wants ABA or her two coexecutors to account for the portion attributable to the percentage of CAC shares formerly owned by the estate.

The Surrogate has sustained her claim. It is obvious that if the brokerage contract was a part of the consideration paid by Talcott for the CAC business, this finding was correct. It is equally obvious that if it was not, no accounting is called for. Furthermore, the determination rests upon what the contracting parties — Talcott and CAC — intended. A great deal of softhearted, and consequently softheaded, thinking (not indulged by the Surrogate) as to what this mother was deprived of resulted in a great deal of testimony having no discernible relevance to the question. Among these was whether the mother had independent counsel to advise her on allowing the ABA contract to be made. This, in view of the fact that she was never a stockholder and the stockholders were independently represented, as was the estate, the chief stockholder.

The issue is not determined by the fact that Talcott would never have entered into the brokerage agreement if it had not bought the CAC business. The issue is whether the brokerage was in reality a disguised payment of a part of the purchase price of CAC or was an independent though related transaction. All of the evidence points to the latter.

Concededly the price of $2,400,000 was all that CAC was worth. No valid reason to suppose that Talcott would pay more for CAC was ever advanced by anyone. In addition, it appeared that after the decedent's death the two Talcott representatives who had been conducting the negotiations were of a mind to discontinue negotiations, at least for a time, in the expectation that later on CAC could be bought at a lower price. This view was overruled by Talcott's president who told them he wanted the Palitz boys in the Talcott organization.

The Surrogate placed considerable reliance on the fact that the ABA brokerage agreement took up the method of calculating commissions in great depth and disposed of the services and the noncompetitive agreements in two paragraphs. From this he concluded that the commissions were intended by Talcott to be additional compensation for the CAC business. As opposed to this is the flat denial of the witnesses who represented Talcott, and the absence of proof of any demand from CAC through any of its representatives of any sum additional to the $2,400,000. From all that appears by proof as distinct from deduction, the brokerage agreement was the price paid by Talcott for something that it wanted in addition to the business of CAC.

It further appears that the salaries of the two Palitz sons paid by Talcott were $40,000 less per annum than they were receiving from CAC. This is a

significant factor in considering whether the brokerage agreement, which was keyed to the amount of business the Talcott department did under their supervision, was designed to make up the difference and further to provide an incentive to increase the amount of business done. It is true that Talcott was disappointed in the Palitz sons' accomplishments and after two years terminated their employment. But the fact that it may have miscalculated the value of their services does not affect what they thought they were worth at the time of hiring; and in view of the estranged relations between Talcott and the Palitz sons at the time of trial it is hard to see why the Talcott executives would seek to mislead the court as to the true nature of the purchase and brokerage transactions.

The Surrogate placed greater reliance on the theory that the Palitz sons took an unfair advantage, and abused a fiduciary relationship. Just what fiduciary relationship is involved is not clear. There was no testimony that they represented or purported to represent the CAC stockholders in any of the Talcott negotiations, although they did represent themselves in negotiating the brokerage contract. Nor as executors did they so negotiate. The so-called breach must therefore consist of the fact that they obtained for themselves what they might possibly have obtained for the corporation. Undoubtedly the Palitz sons owed the ABA contract to their connection with CAC, and they owed that to their family relationship. But that does not automatically make them trustees, either for the stockholders or the other members of their family. If the brokerage contract was payment for CAC, neither the Palitz sons nor anyone else could appropriate the benefits to themselves. But if, in the only view which I believe the evidence admits, it was a bonus for obtaining their future services, neither their former connection with CAC nor their family connections prevents them from taking advantage of it. In effect, the claim of fiduciary relationship adds nothing to the resolution of the problem presented.

It has been pointed out that the Surrogate did not order the respondents to pay over 51% of the amount received on the brokerage contract to the estate but only to account for that share. It is argued that this would enable respondents to establish any equitable claim for compensation that they might have. I am at a loss to see how, short of trying the issue over again, anything is to be accomplished thereby.

Lastly, the Surrogate allowed several claims against the estate by corporate creditors. All of these creditors were corporations of which the deceased or members of his family owned all the stock. The sole evidence of these debts were entries on the books of the corporations. There was no proof of the underlying transactions from which these alleged debts arose. Certain of these claims were rejected by the Surrogate as being barred by the Statute of Limitations, and at least one other was allowed because the statute was tolled. Under these circumstances, where the creditor and the debtor were both under control of the testator, it appears at the very least open to suspicion that these were not real obligations but created by the testator to set up ostensible tax deductions. These claims should not have been allowed without further exploration of their validity.

The decree should be modified to vacate the accounting ordered and to disallow the corporate claims against the estate.

Stevens, P. J., Eager, Capozzoli and Nunez, JJ., concur in decision; Steuer, J., dissents in part, in opinion.

Intermediate decree affirmed on the opinion of Silverman, S., with $50 costs and disbursements to all parties filing briefs separately payable out of the estate.